**In re Anonymous Nos. 8 and 9 D.B. 88**

Disciplinary Board docket nos. 8 and 9 D.B. 88.

*Hearing Committee*, November 22, 1990—

I. INTRODUCTION

On January 20, 1988, the Office of Disciplinary Counsel filed two petitions for discipline, one against [respondent 1] and the other against [respondent 2].

The allegations against these lawyers grew out of their representation of [Mr. A] and his wife [Mrs. A].

On February 21, 1982, [Mrs. A] was a passenger in a [B] jeep driven by her husband which was involved in an accident near [    ], Pennsylvania. The jeep apparently flipped over and [Mrs. A] was seriously injured.

In fact, she remained in a coma for several months. [Mrs. A's] father, [C], sought out [respondent 1], an old family friend.

[Mr. A] also wished to have [respondent 1] represent them because he knew that [respondent 1] cared deeply for [Mrs. A] and would do everything necessary to protect their interests. [Respondent 1] later brought [respondent 2] into the case to assist him in connection with his representation of [Mrs. A] and [Mr. A].

Along the way [respondents] found themselves caught in the middle of a family dispute that was occasioned by the deep-seated animosity that [Mrs. A's] parents, the [C], had for [Mr. A].

The ultimate course of their representation substantially deviated from merely acting as counsel for the [A's] in a tragic automobile accident case. Respondents, especially [respondent 1] became immersed in a plethora of legal and social problems that stemmed from these family problems.

The starting point, of course, is our set of factual findings that embrace our ultimate legal conclusions.

## II. FINDINGS OF FACT

(1) [Respondent 1] was admitted to practice law in the Commonwealth of Pennsylvania on November 1, 1976, and has, at all times relevant hereto, maintained law offices in [    ], Pennsylvania.

(2) [Respondent 2] was admitted to practice law in the Commonwealth of Pennsylvania on June 2, 1958 and, at all times relevant hereto, has maintained law offices in the City of [    ].

(3) These disciplinary proceedings arise from issues that are an outgrowth of respondents' representation of [Mrs. A] and her husband, [Mr. A].

(4) It was on February 21, 1982 that [Mrs. A] was seriously injured in an automobile accident which occurred when a [B] jeep driven by her husband, [Mr. A], "flipped over" and was struck by a truck.

(5) As a result of this accident, [Mrs. A] was in a coma until approximately May 1982 and thereafter began a slow but steady course of rehabilitation; her injuries are permanent, although she is able to walk, talk, and care for her personal needs. She is blind in one eye, cannot see well with the other eye, has mobility limitations, emotional problems, and a severe short term memory deficit.

(6) Shortly after the automobile accident, [respondent 1] was consulted by [Mrs. A's] father, [C], who was a long time friend of [respondent 1]. [Mr. C], was joined by [Mr. A] at this meeting with [respondent 1] wherein they discussed the possibility of [respondent 1] representing [Mrs. & Mr. A] and their two year old son, [J] with respect to claims arising from the automobile accident.

(7) [Respondent 1] agreed to represent the interests of the [As] in claims against [B] and others arising out of the automobile accident and, on March 18, 1982, a contingent fee agreement was executed by [Mr. A].

(8) The contingent fee agreement entered into between [respondent 1] and [Mr. A] as concerns the [B] suit provides that all expenses incurred by [respondent 1] with regard to the claim would be deducted from the gross sum received by verdict or settlement of the claim. (Ex. P-1.)

(9) On August 23, 1983, [respondent 1] entered into a contingent fee agreement with [Mrs. A] to represent [Mrs. A's] interests in the [B] suit. The agreement provides that [respondent 1] is to "advance the expenses of the investigation, institution, prosecution and trial

of the case unless other arrangements are made" and to be reimbursed for such expenses "from the proceeds of any settlement or verdict or other form of recovery." (Ex. P-7.)

(10) Although petitioner maintains that respondent's dual representation of [Mr. & Mrs. A] constituted a conflict of interest ab initio because [Mrs. A] had "a potential claim against [Mr. A] arising out of the accident," we find as a fact that no evidence was presented with respect to the cause of the accident which would enable anyone to reasonably conclude that an actual conflict between the parties existed. The facts presented, as well as the disclosure of the progress of the present lawsuit against [B], suggest that the injuries were caused by a defective product, and not the negligence of [Mr. A]. In any event, petitioner did not present any evidence from which we can conclude that any legitimate claim against [Mr. A] could have been brought by [Mrs. A].

(11) [Respondent 1] knew from his prior contact with [Mrs. A], as well as his discussions with [Mr. A], that no conflicts in the marriage existed prior to the automobile accident.

(12) After [Mrs. A] awoke from a coma in May 1982, she was transferred to [D] Rehabilitation Unit at [E], and was subsequently discharged from [D] on October 8, 1982. Since that date, [Mrs. A] has resided with her parents, the [Cs], at their home in [    ], New Jersey.

(13) Sometime in the fall of 1982, [respondent 1] engaged the services of [respondent 2], with whom [respondent 1] shared offices, to assist him in his representation of the [As].

(14) After becoming involved in the representation of the [As], both respondents continued to act to maintain representation of the [As] in the [B] claim despite the

fact that the intervention of [Mrs. A's] parents led directly to an erosion of the relationship between [Mr. & Mrs. A]. However, at no time, did respondents believe that there was any conflict between the interests of the parties with respect to their claims against defendants in the underlying lawsuit. Moreover, respondents reasonably concluded that the claim itself would be enhanced if the [As] maintained a cohesive family unit, and maintained a united purpose.

(15) [Mr. A] became concerned that the [Cs] were attempting to dislodge his marriage and complained to [respondent 1] that the [Cs] were fostering conflicts in the marital relationship that were inconsistent with [Mr. A's] wishes, and deleterious to the welfare of the [As'] small child, [J].

(16) Both the [Cs] and [Mr. A] constantly sought the assistance of respondents with respect to conflicts that were arising between [Mr. A] and the [Cs]. It was [Mr. A's] desire to resolve the marital conflicts that were spawned by the [Cs] interference which ultimately resulted in the problems which [respondent 1] (and derivatively [respondent 2]) now confronts. Rather than just maintaining the lawsuits, [respondent 1] was asked to play the role of conciliator; a job that he embraced as both friend of the family, and as lawyer responsible for doing that which was necessary to enhance the value of his claim against defendants in the underlying lawsuit.

(17) We find that respondents expended an extraordinary amount of time attempting to deal with family problems that arose from the rupture in the relationship between [Mr. A] and his wife's parents.

(18) Medical experts advised respondents that it would be a full year before the extent of [Mrs. A's] injuries would be known.

(19) When [respondent 1] advised [Mrs. A's] parents that he thought a guardian should be appointed, they strenuously objected. He did, however, advise the [Cs] that if [Mrs. A.'s] short term memory deficit did not improve, a guardian ad litem for the [B] litigation would have to be appointed even if they maintained their opposition. He also advised them that if a settlement offer was made, or a monetary recovery otherwise achieved, a guardian would have to be appointed.

(20) In June 1983, [respondent 1] obtained counsel in [F] County to file a petition in the Orphan's Court, [F] County, on behalf of [Mr. A], to adjudicate [Mrs. A] incompetent and have [respondent 1] appointed as her guardian.

(21) [Respondent 1] was never appointed guardian ad litem for [Mrs. A] as the petition was never pursued in [ ] County. Later, in November 1984, at [respondent 1's] request [Mrs. A] was ruled incompetent by Judge [G], in [H] Common Pleas Court, and a guardian, other than [respondent 1] was appointed for [Mrs. A].

(22) At the time of the accident, the following insurance coverage was held by the [As]:

"(a) The jeep carried bodily injury and Personal Injury Protection insurance under a policy issued by the [I] Insurance Company in which [Mr. A] was named insured and [Mrs. A] was insured as a family member.

"(b) [Mrs. A] owned a [ ] which carried bodily injury and PIP insurance under a separate policy issued by [I] in which [Mrs. A] was named insured.

"(c) Both [Mrs. A] and [Mr. A] had [K] medical insurance derived from their respective employment and covering both of them."

(23) [Respondent 1] assisted [Mr. A] in obtaining benefits due under the insurance policies. In early 1983,

[respondent 1] was informed by [Mr. A] that he was receiving $1,200 per month in benefits from [Mrs. A's] employers and from social security. [Respondent 1] was advised by [Mr. A] that PIP wage loss benefits had ended and [Mr. A] was sending $200 per week to the [Cs] for [Mrs. A's] necessities and utilizing the balance of the benefits toward the payment of the mortgage on the family home, the upkeep of [J] and [Mr. A's] parents' home and upkeep of the marital residence and bills incurred by [Mrs. & Mr. A] prior to the accident.

(24) When the [Cs] advised [respondent 1] that they were not receiving money from [Mr. A], [respondent 1] encouraged [Mr. A] to send funds to the [Cs] as long as [Mrs. A] was staying with them. As a result, in the fall of 1983, all funds went directly to [Mrs. A] with the exception of funds [J] was receiving because at that time [J] was still with [Mr. A].

(25) At all times relevant hereto, respondents believed that the differences and problems that existed were not between [Mrs. A] and [Mr. A]; rather, they reasonably concluded that the problems were being created by the [Cs].

(26) The collateral conflicts which [respondent 1] was called upon to reconcile included such things as striking a balance between the conflicting opinions of experts regarding how much and how often [Mrs. A] should see her son, [J].

(27) Although [respondent 1] consistently attempted to cater to the needs and wishes of the [Cs], he always made it clear to them that he represented only [Mrs. A], [Mr. A], and [J].

(28) In December 1982, [I] determined that PIP benefits in the amount of $195,859.01 were payable on account of the [E] bill. Because [Mr. A's] [K] policies covered and satisfied the bill from [E] as well as other

medical services for [Mrs. A] the [I] monies were now available as a "double dip" payment. Based on [I's] representation to [respondent 1] that the double dip payments were to be paid directly to [Mr. A] as the owner of the policy, as well as [respondent 2's] representation to [respondent 1] that [respondent 2's] research of the law at that time did not disclose who, if anyone, was actually entitled to these monies, [respondent 1] reasonably concluded that [Mr. A] was legally entitled to the double dip payments.

(29) Because [respondent 1] was concerned that [Mr. A] who had been living under the pressure and the disruptions occasioned by the aftermath of the accident, would just "take off," he set about to attempt to fulfill his responsibilities as "family counselor" by persuading [Mr. A] to create a trust for [Mrs. A's] benefit. [Mr. A] agreed to establish a trust, for the benefit of [Mrs. A] "so long as [respondent 1] agreed not to reveal the existence of the money to the [Cs]." Both [respondents 1 & 2] agreed to this condition.

(30) With [Mr. A's] approval, [respondent 1] advised [I] that a trust was going to be created for the benefit of [Mrs. A], of which he would be co-trustee.

(31) By letter dated February 22, 1983, [respondent 1] asked [I] to pay the monies to the trust.

(32) [I] issued a check in the amount of $195,859.01 dated February 28, 1983 payable to [respondent 1] and [Mr. A] as "trustees of the [Mrs. A's] trust, [L] Bank, [   ], Pennsylvania, for the benefit of [Mrs. A]." Based on prior conversations with [I], we find that it is likely that [I] would have issued the check directly to [Mr. A] alone, without any conditions, absent the intervention of [respondent 1].

(33) Under cover of letter dated March 1, 1983, [I] transmitted the check to [respondent 1] which was deposited into the trust account.

(34) [Respondents 1 & 2] drafted a trust agreement which was executed by [Mr. A] and [respondent 1] on March 2, 1983. (Ex. P-50, S.F.-45, S.K.-39.) The agreement provides that the trust monies may be used for (1) the care and maintenance of [Mrs. A] and (2) the care and maintenance of [J] and (3) expenses incurred by [Mr. A] arising out of the accident.

(35) Between March 1983 and January 1984, [respondent 1] caused or permitted to be drawn against the trust account checks to or on behalf of [Mr. A] totalling approximately $62,030 covering such items as expenses incurred for the care of [J] and [Mrs. A], as well as payment for a safe replacement vehicle due to the loss of the family vehicle as a result of the automobile accident. [Respondent 1] also gave [Mr. A] at least $6,500 from the trust fund as unsecured personal loans.

(36) Other monies were paid to the [Cs] from the trust fund in order to maintain [Mrs. A], with [Mr. A's] approval.

(37) From October 1983 through February 1984, despite the terms of the contingent fee agreements, [respondent 1] disbursed funds from the trust account totalling approximately $30,000 to himself and $5,000 to [respondent 2] in connection with expenses incurred with respect to the preparation of the [B] case. These expenses include legal research on "issues relating to incompetency of plaintiff and appointment of guardian," all of which arose from the [B] litigation. These payments were made with the approval of [Mr. A].

(38) With the approval of [Mr. A], [respondent 1] disbursed $12,180 to himself and $35,650 to [respondent 2] from the trust account for professional services rendered by him for the period July 1, 1983 to January 23, 1984 covering his services to [Mrs. A], [Mr. A],

and the [Cs] with respect to domestic relations issues, whose resolution [respondent 1] believed was in [Mrs. A's] best interests. These services were rendered at the insistence and request of [Mr. A] in an effort to preserve the marital relationship, and to keep the family intact, and all payments were made with [Mr. A's] knowledge, permission and approval.

(39) The interests of [Mrs. A] and [Mr. A] in their domestic relations matter did not, as far as [respondent 1] was concerned, differ in any way. [Mrs. A] repeatedly, over a long period of time, stated that [Mr. A] was a kind and gentle man. She evidenced loving feelings for [Mr. A] at a meeting in [respondent 1's] office in September 1983, once she was not under the control and prodding of her parents. [Mr. A] approved of the issuance of funds from the trust account as compensation for respondents, and concluded that the payments were fair and reasonable in view of the extraordinary time expended by both.

(40) On September 21, 1983 [respondent 2] entered his appearance in the [B] suit on behalf of [Mr. A] as an additional defendant as to liability in excess of the $100,000 policy limit only.

(41) On November 4, 1983 [respondent 1] entered his appearance in the [B] suit for [Mrs. A], [Mr. A] and [J] as plaintiffs.

(42) On November 4, 1983 [respondent 2] withdrew his appearance for [Mr. A] as an additional defendant, who was then represented by other counsel.

(43) The foregoing actions by [respondent 2] were taken without [respondent 1's] knowledge.

(44) In or about October 1983, [Mrs. A] and the [Cs] consulted with [M], Esquire, a New Jersey attorney,

concerning the domestic relations issues, and [Mr. C] so advised respondents.

(45) On October 4, 1983, a meeting was held among [Mrs. A], the [Cs], respondents, and [Mr. M], in which a divorce was discussed.

(46) On November 9, 1983 respondents were advised by [N] Esquire, that he now represented [Mr. A] in the custody dispute, a dispute which respondents reasonably conclude was spawned by the [Cs] and not [Mrs. A].

(47) On December 30, 1983 [Mr. A] filed a complaint for custody of [J] against [Mrs. A] in the Court of Common Pleas, [F] County, at no. [   ], on the grounds of [Mrs. A's] alleged mental incompetency.

(48) Each of the parties was represented by independent counsel in the custody proceedings, [Mrs. A] by [O], Esquire and [Mr. A] by [Mr. N].

(49) Respondents were promptly advised of the involvement of these attorneys. Each counsel retained wanted [respondent 1's] help in reconciling the existing problems.

(50) On January 26, 1984 [Mr. M] filed a complaint in divorce on behalf of [Mrs. A] against [Mr. A] in the Superior Court of New Jersey, [   ] County.

(51) [Respondent 1] continued to communicate with [I] on behalf of [Mrs. A] and [Mr. A] with respect to [Mrs. A's] treatment.

(52) [Respondent 1] advised Dr. [P] he would be personally responsible for payment of [Mrs. A's] treatment.

(53) In or about April 1984, [respondent 1] paid Dr. [P] $1,350 by his own check, and then reimbursed himself from the trust.

(54) [Respondent 1's] letter to [Mr. C] of July 2, 1984 that he advanced the $1,350 to pay Dr. [P's] bill was not false. Indeed, respondent correctly believed that [I] would eventually be obligated to pay Dr. [P's] bill and, ultimately, [I] did pay the bill.

(55) The [Cs] in November 1984, obtained counsel to represent [Mrs. A] in the [B] suit. This attorney, [Q] Esquire, notified [respondent 1] of his involvement in the case.

(56) Despite [Q's] urging, [respondent 1] did not release his files to new counsel because he did not believe that [Mrs. A] was competent to hire new counsel.

(57) After hearing from various attorneys purporting to represent the interests of [Mrs. A] and/or the [Cs], [respondents 1 & 2] did not withdraw their appearances because they felt that this was the latest attempt by the [Cs] to interpose their will, and that this was not [Mrs. A's] true desire and, furthermore, were not convinced that she was competent to make such decisions.

(58) However, on May 10, 1985, after further proceedings concerning the appointment of a guardian in the [B] suit, Judge [G] ordered that [respondent 1] withdraw his appearance and, furthermore, appointed [R], Esquire as counsel for [Mrs. A].

On June 24, 1984, [respondent 1] withdrew his appearance as counsel for [Mrs. A] and has, at all times cooperated with [Mrs. A's] court appointed counsel. By order of August 27, 1985, Judge [G] appointed [S], Esquire as guardian ad litem for [Mrs. A].

(59) [Mr. A] retained new counsel in the [B] suit, who entered his appearance on April 23, 1987. Partly as a result of [respondent 1's] original efforts, the action against [B] was, at the time of the last hearing before this panel, on the verge of a very successful culmination.

(60) Some 17 months subsequent to the establishment of the trust, the Superior Court held, for the first time, that a "double dip payment" under the Pennsylvania No-Fault Motor Vehicle Insurance Act was to be paid to the injured person, and not the owner of the policy *(Steppling v. Pennsylvania Manufacturers' Association Insurance Company,* 328 Pa. Super. 419, 447 A.2d 515, [1984]).

Based on the *Steppling* case, various lawsuits were instituted which resulted in, among other things, a *settlement* whereby respondents contributed the fees which they had been previously paid from the trust.

## III. LEGAL CONCLUSIONS AND ANALYSIS

The petition for discipline charges violations of 23 separate disciplinary rules. This committee would be presumptuous in suggesting that these multiple allegations, with all of their permutations and variations, are easily subject to a process of simplification. Yet, a general overview of petitioner's *primary* focus and contentions leads to a helpful lumping together of various areas of concern.

First, petitioner claims that [respondent 1's] original decision to represent both husband and wife in the litigation arising from the accident constituted a conflict of interest. Petitioner further maintains that once family difficulties arose, which were primarily between the [Cs] and [Mr. A], that a conflict between [Mr. & Mrs. A] then clearly emerged requiring that they each have separate independent counsel.

The next set of disciplinary rule violations alleged arise from respondents' failure to have the court appoint a guardian ad litem for [Mrs. A] once it was determined that she was probably incompetent.

Lastly, petitioner alleges that several disciplinary rules were implicated from respondents' handling and ultimate dissipation of much of $195,000 paid by [I] as "double dip payments" to a trust fund established for [Mrs. A] by [respondent 1] and [Mr. A].

We have considered the evidence and arguments of all parties and reach the following conclusions:

A. *Respondents' Representation of Both [Mr. & Mrs. A] in the Litigation Arising From the Automobile Accident Did Not Constitute an Impermissible Conflict of Interest*

The evidence presented at the hearing in the form of both oral testimony and documentary exhibits failed to disclose that the facts of the underlying claim established an adverse position between [Mr. & Mrs. A].

Indeed, the investigation conducted by [respondent 1] ineluctably led to the conclusion that the accident and [Mrs. A's] consequential injuries were caused solely by the [B] jeep's propensity to roll over under similar circumstances.

[Respondent 1's] research showed that this particular make and model jeep had a design defect that caused similar circumstances. Moreover, no evidence was presented from which we can reasonably conclude that [Mr. A] was in any way responsible for the accident. Indeed, there are disciplinary rules that are potentially implicated when a lawyer engages in collusion with his clients in order to make it appear that compensable fault exists where none does. Accordingly, it cannot be said that [respondent 1] was wrong in initially concluding that he could represent both the husband and the wife.

At the inception of the litigation there was apparent harmony between the [Cs] (*i.e.* [Mrs. A's] parents) and [Mr. A]. Both [Mr. A] and [Mr. C] sought out [respondent 1]. Clearly, both trusted [respondent 1] and believed that his friendship and affection for [Mrs. A] would cause him to extend himself beyond what could be expected from a lawyer who was not so personally involved with the family. On this score, they were prophetically correct. Not only did [respondent 1] actively pursue the [B] litigation, he immersed himself in the lives of his clients and their families. It is true, as petitioner maintains, that [respondent 1] tried to be all things to all people. It would, however, be disingenuous to attribute some pejorative labeling of [respondent 1] for his substantial efforts to reconcile family conflicts that he believed had nothing to do with [Mr. & Mrs. A]. Both respondents obviously believed that the [Cs] would eventually be mollified once [Mrs. A] (and, derivatively, the [Cs]) was compensated for [Mrs. A's] serious injuries.

[Respondent 1] knew that [Mrs. & Mr. A] had an excellent marriage before the accident and honestly believed that there was not, in fact, any irreconcilable discord between them. [Mrs. A] met with [respondent 1] in his office, and outside of the presence of her parents, expressed only affection and love for her husband.

Respondents were also encouraged by medical professionals who contended that it was in [Mrs. A's] best interest to keep the marriage intact. [Mr. A], too, wanted the marriage to survive and sought the assistance of respondents to resolve the family problems that arose from the rupture of his relationship with his wife's parents. Accordingly, respondents were clearly attempting to serve the interests and wishes of their clients

(including young [J]) by doing all that they did to try to resolve the conflicts engendered by [Mrs. A's] parents. As time passed, this task became progressively more difficult as the [Cs] became even more alienated from [Mr. A]. Because of [Mrs. A's] fragile condition, respondents believed that the [Cs] were exercising unfair influence on [Mrs. A] who they were caring for in their home. Petitioner's efforts to make it appear that respondents were calculating lawyers attempting to manipulate the parties for their own interest is inconsistent with the facts as we find them. At no time, did either party intentionally fail to seek the lawful objectives of their clients, as they saw them.

Disciplinary Rules 5-105(A) and (C) are designed to promote an attorney's undivided loyalty and fidelity in representing the interests of his client. These rules direct that a lawyer shall not accept employment which may affect his independent judgment in behalf of a client or involve him in representing differing interests *unless* (a) it is obvious that he can represent the interests of each adequately and (b) each consents after full disclosure of the possible effect of such representation on the exercise of his independent judgment. In the present case, respondents viewed the legal interests of [Mrs. & Mr. A] in the litigation spawned by the accident as being in perfect harmony. They did not conclude that there was any conflict in their interests that would affect their independent judgment on behalf of each client. Therefore, as no conflict was perceived, no waiver was required.

Respondents, and especially [respondent 1] acted as lawyers, counselors, conciliators, and ombudsmen for all legal and emotional problems that arose from the tragic accident. Mistakes in judgment were mistakes of the heart, as all decisions were calculated to serve the interests of their clients.

*B. Under the Circumstances of the Present Case, Respondents' Failure To Seek the Appointment of a Guardian for [Mrs. A] Did Not Violate D.R. 1-102(A)(5) or D.R. 1-102(A)(6)*

From the outset, [respondent 1] discussed with [Mr. C] and [Mr. A] his belief that it would probably be necessary to have a guardian appointed for [Mrs. A]. [Mr. C], who was not [respondent 1's] client, adamantly opposed any judicial process that would result in a declaration of [Mrs. A's] incompetence. At the same time, [Mr. A], who *was* [respondent 1's] client, initially wanted to appease the [Cs] and, likewise, opposed the appointment of a guardian. Nonetheless, [respondent 1] made it clear that a guardian would eventually be required if a settlement offer was made or a trial commenced. [Respondent 1] also points out in his argument that the decision whether to have a guardian appointed must be viewed in light of the effect that this judgment would have had on his client. In this regard, [respondent 1] cites Rule 1.14 of the Rules of Professional Conduct, and its comment relating to "Clients Under Disability." The rule provides in relevant part that despite a client's mental disability, the lawyer should, "as far as reasonably possible, maintain a normal client/lawyer relationship with the client." The comment provides in relevant part.

"...if the person has no guardian or legal representative, the lawyer often must act as de facto guardian....

"In many circumstances, however, appointment of a legal representative may be expensive or *traumatic* for the client. Evaluation of these considerations is a matter of professional judgment on the lawyer's part."

[Respondent 1's] counsel thus concludes that the rules contemplate circumstances which would allow a lawyer,

in the interest of his client, to refrain from having a guardian appointed.

However, it is clear that a lawyer cannot perform any act or make any decision which the law requires his client to perform or make. Thus, there are circumstances in which the client must act for himself if competent, or through a duly constituted representative if legally incompetent. Here, respondents knew, or should have known, that [Mrs. A] was incompetent and that applicable provisions of the Pennsylvania Probate, Estates and Fiduciary Code were triggered by her condition. The PEF Code, section 5505(1) requires appointment of a guardian for an incompetent where the real and personal estate of the incompetent has a value in excess of $10,000.

Despite the opposition of the [Cs] and [Mr. A] respondents should have sought the appointment of a guardian in a more timely fashion. Eventually, in late 1984, [respondent 1] did petition the court for the appointment of a guardian.

Respondents' failure to act was not prompted by anything other than a desire to accommodate the wishes of his client, [Mr. A] and his client [Mrs. A's] parents. Since [respondent 1] himself could have literally designated the personal representative when he was in control of the litigation, he had absolutely nothing to gain personally by failing to petition the court earlier.

Because of the tumultuous relationship that developed between [Mr. C] and [Mr. A], and [Mr. A's] insistence that respondents assist him in resolving the marital conflicts engendered by his difficulties with his in-laws, respondents delayed petitioning the court for a guardian.

Other factors prompted this decision. First, [Mrs. A's] doctors suggested that it would be at least one full year before the extent of [Mrs. A's] injuries would be

known. Respondents obviously knew that the litigation would not be concluded before that time. Most significantly, respondents did not perceive any conflict between [Mr. & Mrs. A's] interests, and felt that [Mr. A] was only concerned with maintaining the family unit. Clearly, self-interest did not motivate respondents' decision to forestall the appointment of a guardian. Their decision was prompted only by their desire to accommodate the wishes of everyone, and maximize the chance of restoring family harmony.

In the present case, under the present circumstances, it cannot be said that respondents' failure to petition for a guardian at an earlier time constituted conduct that rises to a violation of D.R. 1-102(A)(5). We do not conclude that this conduct was "prejudicial to the administration of justice." Likewise, we find that their motives were pure and that anyone objectively viewing their conduct would necessarily conclude that their behavior did not "adversely reflect on his (their) fitness to practice law."

As respondents have conceded, mistakes in judgment were made. However, a violation of D.R. 1-102(A)(6) did not occur.

### C. *[Respondent 1] Did Hot Have a Conflict of Interest in Setting Up the Trust, But Did Have a Conflict of Interest in the Administration of the Trust*

Petitioner claims that respondents, particularly [respondent 1], mishandled and misappropriated funds that were paid by [I] insurance division for medical bills incurred by [Mrs. A]. These funds were $195,859. Because [K] coverage had already satisfied these bills,

the [I] funds amounted to duplicative benefits or, as is commonly referred to, a "double dip" payment.

The briefs for Disciplinary Counsel and respondents contain much discussion of who was legally entitled to the double dip funds ([Mr. & Mrs. A]), and who first suggested the idea of putting the double dip funds in trust for [Mrs. A]. The briefs then contain various legal conclusions depending on how these questions were answered.

Regardless of who was entitled to the funds, certain facts are clear. [I], [respondent 1] and [Mr. A] all agreed to the trust for [Mrs. A].

Although each may have had their own reasons for agreeing to the trust, the trust was established and the funds paid into it.

This being the case, we conclude that it is technically immaterial whether [I] might properly have paid the funds to [Mr. A] rather than [Mrs. A]. The funds were not paid to [Mr. A].

The propriety of the conduct of [respondents 1 & 2] now under scrutiny must be judged against the fact that the funds were paid to the trust; not against some other hypothetical scenario which might have happened but did not.

On the other hand, if [respondent 1] believed that the double dip funds were going to be paid by [I] directly to [Mr. A], then it is to his credit as a counselor that he spoke out for a trust for [Mrs. A's] benefit and this belief bears heavily on his good faith in subsequent disbursements of the trust funds.

At the outset, we should examine, under the Disciplinary Rules, [respondent 1's] conduct in setting up a trust for his client [Mrs. A] rather than urging direct payment of the funds to his client [Mr. A]. We make

the conclusion of law that [respondent 1] had no conflict of interest in this respect because [Mr. A] consented to the trust after full disclosure. Examining the specific expenditures made by [respondent 1] to [Mr. A] from the trust fund, we find as follows:

We first consider payments of approximately $62,000 to [Mr. A] and conclude that they were directly or indirectly for the benefit of [J] and [Mrs. A] and consistent with the trust document. For example the disbursements included an amount to replace [Mr. A's] jeep which was destroyed in the accident. This was also for the benefit of [Mrs. A] and [J] in providing transportation for [Mr. A] to visit them.

It must be remembered that the trust document was broadly drawn with view toward benefiting both [Mrs. A] and her son as well as toward preserving the [A] family unit.

Consider next, the various payments by [respondent 1] from the trust funds to himself or [respondent 2] including the amounts paid as fees for domestic relations services. We have found that respondents provided the services claimed and we believe that these services were for the benefit of [Mrs. A] in maintaining family unity, and were also clearly a result of the accident, since all the evidence is that the marriage was a very loving one, and the expense was incurred by [Mr. A] who requested and approved the services.

Unfortunately, payments to [respondent 1 & 2] for reimbursement of these expenses of the [B] suit, are not so easily disposed of.

[Respondent 1's] reimbursement of these expenses is clearly contrary to the contingent fee agreements he had previously signed separately with [Mr. & Mrs. A]. In both of these agreements it was provided that expenses would be reimbursed out of the verdict or

settlement award, if any. The fact that co-trustee [Mr. A] may have approved the payment is immaterial since there was no guardian for [Mrs. A] to act for her and she was incompetent by [respondent 1's] own admission.

Indeed, [respondent 1] himself has offered no justification for the payments other than the involved claim in his brief (page 55) where he attempted to equate the double dip funds to a litigation settlement.

Accordingly, we find as a conclusion of law that [respondent 1's] payment, as co-trustee, to himself and [respondent 2] as attorneys for the [As], of the [B] expenses was a conflict of interest and a violation of D.R. 5-105(B). We also find that the payments were a clear violation of the contingent fee agreements, and a violation of D.R. 1-102(A)(5).

[Respondent 2's] predicament with respect to reimbursement of the [B] expenses is no better than [respondent 1's]. Although representing [Mr. & Mrs. A], [respondent 2] had no fee agreement with either client and thus was not entitled to any reimbursement of expenses. Indeed [respondent 2] does not argue that he was. We find that [respondent 2] violated D.R. 1-102 (A)(5).

## IV. CONCLUSION

In view of the aforesaid finding of breach of the Disciplinary Rule a further hearing will be held with regard to the proposed sanctions.

* Hearing Committee Member [    ] will be filing a separate dissenting opinion.

## DISSENTING OPINION

Report by Member [    ], November 27, 1990— Member [    ] concurs in the report of the Hearing

Committee, submitted by Messrs. [    ], except for section IIIC thereof from which member [    ] dissents. Section IIIC of the Hearing Committee report relates to the creation of the trust fund and the dissipation of its assets. Sections I, II, III A-B and IV are acceptable to [    ]. [    ] legal analysis of the trust fund matter is attached.

Consistent with the above, [    ] concurs in the 60 findings of fact of the Hearing Committee report except for findings of fact 28-39, which are those relating to the trust fund. In lieu of findings of fact 28-39, [    ] substitutes findings of fact 28-47. Findings of fact 1-27 and 40-60 of the Hearing Committee report are acceptable to [    ], although the latter group would need to be renumbered to accommodate [    ] substitution.

[    ] FINDINGS OF FACT RE TRUST FUND

(28) In December 1982, [I] determined that PIP benefits in the amount of $195,859.01 were payable on account of the [E] bill. (F.A.-36, S.K.-32.) Because the underlying charges had already been paid by [K], the [I] monies were now available as a "double dip" payment. It was available under either [Mr. A's] policy or [Mrs. A's] policy since the benefits were the same under either. (N.T.-I, 87.)

(29) Because [respondent 1] was concerned that [Mr. A], who had been living under the pressure and the disruptions occasioned by the aftermath of the accident, would just "take off" if the double dip funds were paid to [Mr. A], [respondent 1] determined that it would be in [Mrs. A's] best interest to establish a trust for [Mrs. A's] benefit with the double dip funds. (N.T.-V, 53, N.T.-IV, 62.)

(30) Because [I] was concerned that [Mr. A], who had been living under the pressure and the disruption occasioned by the aftermath of the accident, would just "take the money and run" if the double dip funds were paid to [Mr. A], [I] determined that it would be in their and [Mrs. A's] best interest to establish a trust for [Mrs. A's] benefit with the double dip funds. (N.T.-I, 50-55, 90-96, P-115, P-116.)

(31) [Mr. A] agreed to establish a trust for [Mrs. A's] benefit because he wanted to provide for [Mrs. A's] care. (N.T.-V, 53.) [Respondent 1] agreed with [Mr. A] that [respondent 1] would not disclose the existence of the trust to the [Cs]. (NT-V, 66.)

(32) [Respondent 1] advised [I] that he and [Mr. A] had agreed to create a trust for [Mrs. A's] benefit with [respondent 1] and [Mr. A] as co-trustees. (N.T.-I, 53-54, P-116.)

(33) By letter dated February 22, 1983, [respondent 1] asked [I] to send him the check made out to [respondent 1], Esquire and [Mr. A], trustees of the [Mrs. A] trust. (S.F.-41, S.K.-47, P-47.)

(34) Under cover of a letter dated March 1, 1983, [I] transmitted a check for $195,859.01 dated February 28, 1983 to [respondent 1] which was deposited in the trust account. The check was payable to:

"[Respondent 1], Esquire and [Mr. A], trustees of the [Mrs. A] trust, [L] Bank, Philadelphia, Pa., for the benefit of [Mrs. A]." (P-48, S.F.-43.)

(35) By letter dated March 11, 1983, [respondent 1] provided the trust document to [I]. (S.F.-48, P-49.) The trust document was executed on March 2, 1983 and provides that the trust monies may be used for (1) the care and maintenance of [Mrs. A], (2) the care

and maintenance of [J] and (3) expenses incurred by [Mr. A] arising out of the accident. (P-50.)

(36) Between March 1983 and January 1984, [respondent 1] issued trust account checks to or on behalf of [Mr. A] totaling approximately $62,000 covering the following: (P-156.)

| | |
|---|---|
| $14,475 | for payment to [ ] who was caring for [J] |
| 7,200 | for payment to [Cs] who were caring for [Mrs. A] |
| 22,071 | for one car and two trucks for [Mr. A] |
| 3,752 | to pay credit card and department store accounts |
| 11,284 | for existing loan payment and new loan |
| 3,248 | for furniture, house repairs and wedding album |
| $62,030 | Grand Total. The total of the last four items is $40,355. |

(37) From October 1983 through February 1984, [respondent 1] disbursed funds from the trust account totaling approximately $30,225 to himself and $5,002 to [respondent 2] for expenses incurred with respect to the preparation of the [B] case. (S.F.-65, S.K.-43.)

(38) Between September 1983 and January 1984, [respondent 1] disbursed $12,180 of trust funds to himself for professional services with respect to domestic relations issues rendered by him to [Mrs. A], [Mr. A], and the [Cs] during the period July 1, 1983 to January 23, 1984. The disbursement was approved by [Mr. A] but not by [Mrs. A] or the [Cs]. (S.F.-66.)

(39) Between September 1983 and January 1984, [respondent 1] disbursed $35,670 of trust funds to [respondent 2] for professional services with respect to domestic relations issues rendered by him to [Mr. & Mrs. A] during the period July 1, 1983 to January 23,

1984. (S.K.-44 and P-164.) [Mr. A] approved the payment.

(40) Between February 3, 1983 and June 20, 1983, [respondent 2] made loans to Mr. [C] in the amount of $7,300. (S.F.-58, S.K.-45.)

(41) In October 1983, [respondent 1] paid $7,300 from trust funds to [respondent 2] as reimbursement for the loans. (S.F.-60, S.K.-47.)

(42) In April, 1984, [respondent 1] requested [respondent 2] to pay [Mr. C] $5,000 which [respondent 2] did, and [respondent 2] was immediately reimbursed by [respondent 1] from trust funds. (N.T.-V, 99-100.)

(43) The transaction in finding of fact 40 was intended by [respondents 1 & 2] to conceal the existence of the trust from the [Cs]. (N.T.-V, 100.)

(44) The sum total of the payments made to [respondents 1 & 2] in findings of fact 35-39 is approximately $90,377. (The $5,000 in finding of fact 40 is not included in this total because it is tantamount to a payment directly to [Mr. C] i.e., [Mrs. A].)

(45) In June 1983, [respondent 1] obtained counsel in [F] County to file a petition in the Orphan's Court, [F] County, on behalf of [Mr. A] to adjudicate [Mrs. A] incompetent and have [respondent 1] appointed as her guardian. (P-17.)

(46) The above petition contained a sworn statement by [respondent 1] that "He is not the fiduciary of an estate in which the alleged incompetent has an interest and he has no interest adverse to the alleged incompetent." (P-17.)

(47) In failing to disclose the trust for [Mrs. A] this sworn statement by [respondent 1] was false and known by [respondent 1] to be false. (N.T.-V, 89, note there are two pages 89 in N.T.-V.)

## [    ] LEGAL ANALYSIS AND CONCLUSION
## RE TRUST FUND

*[Respondent 1] Did Not Have a Conflict of Interest in Setting Up the Trust, But Did Have a Conflict of Interest in the Administration of the Trust and Trust Funds Were Misapplied By [Respondents 1 & 2]. In Addition, the Existence of the Trust Was Deceptively Concealed*

I agree with the Hearing Committee report that once the trust was established, the appropriateness of the expenditures therefrom is governed by the trust document, not by what might have happened to the money if there had been no trust.

The Majority implies, however, that [respondents 1's] handling of the trust funds should be viewed liberally, because [respondent 1] spoke out for the trust for [Mrs. A] at a time when it was still possible for the funds to be paid to [Mr. A], never to be seen again.

I do not make this judgment. For one thing, and as my findings of fact indicate, I am not persuaded that the funds would have been paid to [Mr. A] absent [respondent 1's] intervention.

[I] testified just the opposite. Secondly, controlling the double dip funds through a trust for [Mrs. A] is as consistent with a desire to keep personal control of the [B] suit as it is with compassion for [Mrs. A]. I prefer not to make such choices; rather we should compare *each* expenditure with the trust document and determine the correctness on that basis. If [respondent 1's] good faith is relevant at all, it would only be in the case of a borderline situation, of which I do not believe there are any here, or where the rule in question itself makes it so.

My examination of the trust fund disbursements shows that approximately $90,000 of the trust funds (findings of fact 44) were paid out to [respondents 1 & 2] with little, if any, benefit for [Mrs. A], and $40,000 of trust funds (findings of fact 36) were paid to [Mr. A], with not only no demonstrable benefit to [Mrs. A] but also with no relation to the accident. Thus, we are now faced with the surprise ending that even though everyone wanted a trust to help [Mrs. A], she received only about 30 percent of the disbursed funds.

[Respondent 1] paid himself $30,224 and [respondent 2] $5,000 for expenses in connection with the [B] case. I agree with the Majority that these payments were improper since [respondents 1's] contingent fee agreements, which he had previously signed separately with [Mr. & Mrs. A], provide that these expenses shall be recovered from the verdict or settlement, if any. The fact that co-trustee [Mr. A] may have approved the payments, which might otherwise have eventually gone to [Mrs. A], is immaterial, since there was no guardian for [Mrs. A] to act for her, and she was incompetent by [respondent 1's] own admission. [Respondent 1's] justification in his brief (page 55) for these payments, by equating the double dip funds to a litigation settlement, is disingenuous, at best.

[Respondent 1] paid [Mr. A] some $22,000 for the purchase of two trucks and one automobile, the justification being that [Mr. A] needed transportation to work and to see [Mrs. A] and [J]. These expenses clearly did not arise out of the accident, since [Mr. A] had been paid the jeep insurance damage claim, nor are they more than minuscule for [Mrs. A's] benefit, and they are a mishandling of the trust funds.

The payments to [Mr. A] of approximately $18,000 for loans and charge accounts are a further mishandling

of the trust funds. The expenses involved are nothing more than [Mr. A's] personal living expenses.

[Respondent 1] disbursed $35,670 to [respondent 2] and $12,180 to himself for legal fees for domestic relations services. These services mainly amount to "keeping the peace" among [Mr. A] and the [Cs], as opposed to either counselling or advocacy legal services. If there were any legal services, they were not documented. The payments are in no way within the ambit of the trust agreement. Even [respondent 2] admits in his brief (page 29) that these fee payments by [respondent 1] were improper. Since [respondent 2] was aware of the trust agreement, he is as responsible as [respondent 1] for the payments to [respondent 2].

[Respondent 1's] general justification for the above payments is the conclusion that all payments were "related to the trust documents" and, in addition, that they were approved by [Mr. A]. (N.T.-V, 57.) [Mr. A's] justification is that, with the exception of the lawyer's fees, all payments "related to family." (N.T.-V, 64.) As to the lawyer's fees, [Mr. A's] justification for the payments was that it was "my money, which is in trust." (N.T.-V, 69.) None of these explanations reflects any effort to explain how each payment relates to the specific language of the trust.

[Respondent 2's] payment of $5,000 to the [Cs] conditioned upon immediate reimbursement by [respondent 1] from trust funds was an effort by [respondent 2] to help [respondent 1] honor [respondent 1's] promise not to let [Mr. C] know of the trust fund. (N.T.-V, 100.) Although there is no legal obligation to make such a disclosure, there is an obligation not to engage in deceptive conduct.

[Respondent 1's] efforts to conceal the trust fund from the [Cs] peaked in June 1983, with his sworn

false statement contained in his petition to make himself guardian of [Mrs. A], which he filed in [F] County Orphans' Court through local counsel. (P-17.) The sworn false statement was that he was not the fiduciary of any estate in which [Mrs. A] has an interest when he was, in fact, co-trustee with [Mr. A] of the [Mrs. A] trust.

Although the petition was not pursued, indeed it was later withdrawn, it is a rather frightening display of the means [respondent 1] was willing to use to maintain family harmony or, should it be said, control of the [B] suit.

The record is devoid of any valid explanation by [respondent 1] of this action, and his brief (page 59) only makes the rather lame conclusory offering that if [respondent 1] were called to testify in respect of the petition for custody, he would do so truthfully.

[Respondent 2] urges that his $7,300 payment from his attorney account to [Mr. C] was, indeed, a loan and was not an additional effort to conceal the trust fund from the [Cs]. If it was indeed a loan, then it is a personal undertaking of [respondent 2] and not reimbursable from the trust fund, which [respondent 2] well knew.

We should be mindful of [respondent 1's] many proper efforts to maintain some semblance of civility between [Mr. A] and the [Cs] in spite of the intense animosity they mutually felt for each other. Indeed, his ability to be the family counselor came from his long-term friendship with [Mr. & Mrs. A], which is why he was retained by them in the first instance.

It is unfortunate, certainly ironic, that but for [respondent 2's] efforts to keep the family together, to preserve the [B] suit, he would not be in this disciplinary proceeding today; for it is those same efforts which

seem to have blinded [respondent 1] to the conflict of interest inherent in the manner the trust was administered and to the accompanying deceptive practices noted above. Although I do not ascribe any dishonest or deceitful intentions to [respondent 1] in the payments per se from the trust fund, preferring instead to attribute them to a "keep everyone happy" approach, he allowed himself to be placed in a situation where a conflict of interest was unavoidable and misapplication of the funds likely.

In view of the above, I make the following conclusions of law:

For [respondent 1] to act as a co-trustee of the trust with [Mr. A], while simultaneously representing beneficiaries [Mr. A] and the incompetent [Mrs. A], and to pay [Mr. A] and himself some $130,000 of the trust funds, with payments to each being approved by the other, is a clear conflict of interest and I so find as a conclusion of law. To engage in such conduct is a violation by [respondent 1] of D.R. 5-105(A)-(B).

I also find as a conclusion of law that the payments described above ($40,355 to [Mr. A] and $90,377 to [respondents 1 & 2] are improper and a violation by [respondent 1] of D.R. 1-102(A)(5) and (6). Since [respondent 2] was aware of the provisions of the trust, the payments to him ($47,972) are a violation of D.R. 1-102(A)(5) and (6) by [respondent 2].

I find that the actions of [respondents 1 & 2] with respect to the $7,300 and $5,000 payments were a deceptive effort to conceal the trust from the [Cs] and a violation of D.R. 1-102(A)(3)-(6) inclusive.

Finally, I find that the sworn false statement of [respondent 1] in connection with the petition for custody is a violation of D.R. 1-102(A)(4) and (A)(5) and D.R. 7-102(A)(5).

### FINAL REPORT OF THE HEARING
### COMMITTEE ON THE DISCIPLINE
### TO BE IMPOSED

January 17, 1991—On November 21, 1990, our Hearing Committee filed its Majority report in this case. Subsequently, a separate dissenting report was filed by committee member [    ].

A separate hearing was convened on December 19, 1990, at which time additional evidence was admitted pursuant to section 89.151 of the Disciplinary Board Rules.

With respect to [respondent 1], we make the following additional findings:[1]

(1) [Respondent 1] lives at [    ]; he was born September 18, 1949; he is married to [    ] who is also an attorney who practices law in [    ].

(2) [Respondent 1] graduated [    ] University in 1972, earning a B.A. degree at that time; he graduated [    ] University Law School, earning a juris doctor degree in 1976.

(3) He was admitted to practice law in the Commonwealth of Pennsylvania in November 1976, and was subsequently admitted to the United States District Court for the [    ] District of Pennsylvania.

(4) His employment history includes the following:

(a) Law clerk to the Honorable [    ], 1977 to 1981;

(b) Sole practitioner in the firm of [respondent 1], Esquire from 1976 to 1989, offices located in [    ];

(c) Partner in the firm of [    ], P.C., since May 1989, to the present;

---

1. Some of these findings were incorporated in our original Majority report; for the sake of convenience certain findings are reiterated here.

(d) As a sole practitioner, he practiced in an office suite at [    ] that included among others: [respondent 2], [T], [U], [V], [W], & [X].

(5) [Respondent 1's] practice today includes a full range of personal injury work, criminal law, and FELA. [Respondent 1] has had extensive trial experience in the areas of criminal law, trying homicide cases to verdict, and extensive experience in the areas of asbestos and FELA matters.

(6) [Respondent 1] has been very active in the [H] Bar Association. He is a member of the following committees: Bar-News Media Committee, Criminal Justice Committee, Medical Legal Committee, Bench Bar Committee, Long Range Planning Committee, Judicial Selection and Retention Committee (during the pendency of these proceedings, [respondent 1] specifically asked to be an inactive member of the Judicial Selection and Retention Committee). [Respondent 1] was chairman of the Bar-News Media Committee in 1984 and 1985.

(7) [Respondent 1] is a member of the American Bar Association, the Pennsylvania Bar Association, the [H] Bar Association, the American Trial Lawyers Association and the [H] Trial Lawyers Association. He has frequently taken the continuing legal education courses provided by the Pennsylvania Bar Association.

(8) [Respondent 1] is currently the treasurer of the [    ] Society and has been a board member of the [    ] Society for the past five years. He is also a member of the Men of [    ], Sons of Italy, [    ] Parish, and [    ] Law School Alumni Association.

(9) [Respondent 1] has been extensively involved in charitable works and communal affairs. In this regard, he has been involved with the [    ] Committee for the Homeless since its inception by Father [    ] in 1978. He is also involved in the Mothers Christmas

Club, which is a [H] mothers organization which provides toys at Christmas for needy children. He has also served as an appointed member of the Mayor's Task Force under the then Mayor [   ] and he also has served on the committee that redistricted the political boundaries of [H]. His charitable works include his donation of a scholarship provided for the last two years for deserving American Indian students. This scholarship was established by [respondent 1] in honor of his uncle, [   ] whose son, [   ], has taught American Indian children in Arizona and Colorado for the last twelve years. [Respondent 1] also has been involved in the charitable activities of the [   ] Club and the [H] Optimist Club. He was also involved in the [   ] Show for many years in the capacity of helping to carry handicapped and wheelchair-bound children to their seats.

(10) The present matter before this panel is the only disciplinary proceeding or problem that [respondent 1] has ever faced.

(11) A number of character witnesses appeared during the original proceedings held by the Hearing Committee. All of those witnesses vouched for [respondent 1's] competence and excellent reputation in the community. At the December 19 hearing, his present partner, [U], testified as did the Honorable [T], a member of the United States House of Representatives. [Respondent 1's] wife, [   ], also testified. Each of the character witnesses made it clear that [respondent 1] enjoys an outstanding reputation for being a decent and honorable man.

(12) [Respondent 1] testified and sincerely acknowledged his mistakes in the matter that gave rise to the instant proceedings.

We make the following additional findings with respect to [respondent 2]:

(1) [Respondent 2] graduated [     ] Law School in 1957. [Respondent 2] has been practicing law since 1958.

(2) He is married, has six children, three of whom are dependent on him fully, and one is partially dependent on him.

(3) In the 33 years that [respondent 2] has been practicing law, he has never before been the subject of a disciplinary action, despite the fact that he has represented well over 2,000 clients.

The members of this Hearing Committee have spent a considerable amount of time discussing all of the aspects of this case, especially the history of respondents' involvement with the clients whose cause ultimately led to the present proceedings. As our original reports (both majority and dissenting reports) made clear, the mistakes that were made were those that were caused by [respondent 1's] sincere desire to advance the interests of [Mr. & Mrs. A] who were his friends and clients.

Although our committee found the need to file two reports because we could not unanimously agree on the extent of the disciplinary rule violations involved in the present matter, we are in complete accord on the discipline to be imposed.

Rule 204 delineates the types of discipline that are contemplated when our disciplinary rules are violated by attorneys. The hours of observation of respondents that these extensive hearings have spawned has further solidified our conclusion that we have taken the full measure of these men; that the mistakes made in this case are isolated ones, and that both respondents are otherwise good lawyers and good men who have grievously paid for their mistakes.

While it is true that petitioner and respondents have clashed on many questions of fact, it is equally clear

that we, as the factfinders, are in the best position to objectively assess credibility questions. See generally, *Office of Disciplinary Counsel v. Ewing,* 496 Pa. 35, 436 A.2d 139 (1981). We have found that respondents did not intentionally fail to serve their clients' interests.

We have unanimously concluded that a private reprimand is the appropriate discipline for both respondents because the isolated lapses in judgment that gave rise to these proceedings essentially arose from their negligence in dealing with client property and their negligence in determining whether their representation of [Mrs. A] was materially affected by their own interests. As our earlier reports suggested, we found that the extenuating circumstances and unusual events present here caused these well-intentioned lawyers to step over the line.

It is also noted that respondents' astute representation of their clients and their development of a theory of liability against [B] inevitably led to a very favorable financial resolution of [Mrs. A's] personal injury claim. [Respondent 1's] counsel has forcefully argued that [respondent 1] is the only person who has really lost anything. In this regard, counsel has suggested that [respondent 1] who originally had a contingent fee interest in [Mrs. A's] underlying claim, incurred losses of over $1,000,000. He arrives at this figure by calculating the reimbursements made for the case costs originally advanced from the double dip payments, as well as the substantial loss of the ultimate fee that would have been generated had [respondent 1] continued to represent [Mrs. A]. While the record does not support a conclusion of the exact losses suffered by [respondent 1] it is clear that respondents did repay their clients for the costs which we concluded they improperly advanced themselves, and that both have voluntarily

agreed not to accept any fee for their efforts in the underlying case which resulted in a substantial financial settlement. Surely, on a quantum meruit basis alone [respondent 1] would have been entitled to a sizable fee.

We would be remiss in failing to specifically note that which we observed at the December 19 hearing. At one point, [respondent 1] broke down and began to weep when he discussed his "personal imprisonment" ever since these proceedings were initiated. [Respondent 1] is a proud man who has been shamed by this experience. He once held aspirations of one day becoming a judge, but feels that this blot on his record will make that dream impossible. His wife has also related her observations of the emotional trauma suffered by her husband.

Likewise, [respondent 2] has been humbled by these proceedings, and has conveyed to the committee his remorse and the personal toll that these proceedings have exacted from him.

The 18th century Italian penologist Beccaria once declared that when we overpunish a person, we penalize that part of the person that is innocent as well. Anything other than an informal reprimand would exact a punishment that would be disproportionate to each respondent's own level of culpability in the present case.

Accordingly, the committee *unanimously* recommends that the appropriate type of discipline in the present case is an informal reprimand for both respondents.

## ADDENDUM BY MEMBER [    ]

Since I found [respondent 1] in violation of significantly more disciplinary rules than did my colleagues

[    ], I find it compelling to make additional, supportive comments concerning him.

Just as I had no doubts about my findings on the violations, I also have no doubts that the public is not only protected, indeed *it is well served,* by our recommended private reprimand for [respondent 1].

It is clear from the record in this proceeding that [respondent 1] epitomizes the fundamental element of any vocation which claims to be a profession—service to his fellow man. When we write that lawyers should give something back to the community they take it from, we need look no further than [respondent 1] as one to emulate.

[Respondent 1's] involvement in a legion of service organizations is well-known and described in paragraph 9 of the accompanying report. His deep *personal involvement* in these activities ranges from board memberships to establishing a scholarship with his own money to carrying both toys to needy children at Christmas as well as crippled children to their seats at the [    ] Show.

[Respondent 1's] character witnesses include those who not only are aware of his reputation in the community but who also have worked with and closely associated with [respondent 1] for many years, and thus have direct, first-hand exposure to the kind of person [respondent 1] is.

The picture of [respondent 1] that we draw from his community service and from the witness provided by those who watch [respondent 1] in action is one of the highest character and integrity. The picture belies any notion of [respondent 1] as one who would intentionally do anything that would prejudice his clients or who would intentionally act in his own self-interest

at his clients' expense. Everything we hear or observe about [respondent 1] is exactly the opposite.

The circumstances surrounding [respondent 1's] disciplinary transgressions made him the forced conciliator in an emotion-charged, family atmosphere where different sides of the family had their own agendas and neither trusted the other. [Respondent 1] clearly made and clearly admits to mistakes in judgment in attempting to balance these interests. Just as clearly, these mistakes did not come from a scheming or dishonest person.

The purpose of the disciplinary system is to protect the public. [Respondent 1's] own testimony at the hearing on sanctions showed, in a way difficult to appreciate unless present, the shame and emotional trauma these lengthy disciplinary proceedings have wrought on him.

From a punishment aspect, the personal shame already suffered by [respondent 1], plus that incident to the recommended private reprimand, is adequate penalty for his disciplinary violations. This is well articulated in the accompanying report. On the other hand, shame and remorse are not, in and of themselves, *necessarily* adequate to secure the public from future misdeeds. Whereas here, however, they are coupled with an admission of wrongdoing, an increased sensitivity to the disciplinary rules, and, most importantly, a not just heretofore unblemished but a preeminent record of character and integrity, then the public is at little risk in allowing [respondent 1] to continue to practice law without interruption. I strongly urge that all these other factors have been amply demonstrated and that the private reprimand is ample sanction.

## ORDER

And now, April 10, 1991, upon consideration of the report and recommendation of Hearing Committee [    ]

52

filed November 22, 1990; it is hereby ordered that the said [respondent] of [   ] be subjected to private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania as provided in Rule 204(a)(5) of the Pennsylvania Rules of Disciplinary Enforcement. Costs are to be paid by the respondent.

### ORDER

And now, April 10, 1991, upon consideration of the report and recommendation of Hearing Committee [   ] filed November 22, 1990; it is hereby ordered that the said [respondent] of [   ] be subjected to private reprimand by the Disciplinary Board of the Supreme Court of Pennsylvania as provided in Rule 204(a)(5) of the Pennsylvania Rules of Disciplinary Enforcement. Costs are to be paid by the respondent.